IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SEA VILLAGE MARINA, LLC., | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | No. 09-3292 (JBS-AMD) |
| v. | : | |
| | : | |
| A 1980 CARLCRAFT HOUSEBOAT, | : | **OPINION** |
| HULL ID NO. LMG37164M80D, et | : | |
| al., | : | |
| | : | |
| Defendants. | : | |

APPEARANCES:

Daniel Harold Wooster, Esq.
Michael Barry Mccauley, Esq.
PALMER, BIEZUP & HENDERSON, LLP
330 Market Street
Camden, NJ 08102-1524
    Counsel for Plaintiff

Eric J. Goldring, Esq.
GOLDRING & GOLDRING, P.A.
2 Bridge Avenue
Suite 634
Red Bank, NJ 07701-5622
    Counsel for Hull IDs LMG37174M80E & MZIE12074783

Linda L. Campbell, Esq.
KEARNEY & ASSOCIATES, P.C.
210 White Horse Pike
P.O. Box 279
Haddon Heights, NJ 08035
    Counsel for Hull ID NO. MZIB30310883

Margarette Burroughs, Pro Se
P.O. Box 209
Richland, NJ 08350
    and
Stuart Wolf, Pro Se
2312 New Road
Northfield, NJ 08225
    For Hull ID NO. LMG37164M80D

**SIMANDLE**, District Judge:

This is one of those hard cases in which the Court must navigate the outer boundary of a foggy category.  Plaintiff seeks to enforce maritime liens against four floating homes moored in Plaintiff's marina.[1]  This matter is before the Court on its own motion to examine the question of whether the Court has subject matter jurisdiction in admiralty under 28 U.S.C. § 1333 [Docket Item 21].  To determine whether it has admiralty jurisdiction, the Court must decide whether the floating homes constitute vessels.  The only precedent on point finds similar craft to be vessels, and these homes are not so permanently moored as to be stripped of that status.  Therefore, the Court finds that it has subject matter jurisdiction.

## I.  BACKGROUND

Plaintiff, Sea View Marina LLC, operates a marina in Atlantic County, New Jersey.  (Compl. ¶ 9.)  The marina is on a waterway known as the Dock Thorofare, a channel off of Lakes Bay near Atlantic City that is part of the Atlantic Intercoastal Waterway.[2]  (Id.)  The marina provides dockage and "other

---

[1]  The use of the descriptor "floating homes" should not be taken as a judgment with any legal meaning.

[2]  The Atlantic Intercoastal Waterway is a navigable series of sounds, bays, lagoons, rivers, and canals near the Atlantic Coast used primarily as a shipping route.  Intracoastal Waterway,

necessaries" to the defendant floating homes, for which, Plaintiff alleges, it has not been paid.[3]  (Id. ¶ 11.)  Plaintiff therefore seeks a maritime lien against each houseboat pursuant to 46 U.S.C. § 31342 (2006).[4]  (Id.)

Sea Village Marina is an uneasy hybrid between a condominium complex and a traditional marina, servicing primarily long-term occupants of floating homes.  (Defs. Allen & Patterson Br. Opp. Admiralty Juris., Ex-1.)  In part because the marina is neither fish nor fowl, it has been the continued subject of litigation and negotiation with Egg Harbor Township and the New Jersey Department of Environmental Protection over zoning, development, and clean water issues.  (Defs. Allen & Patterson Br. Opp. Admiralty Juris., 2-5.)  Plaintiff and the owners of the floating homes are involved in an ongoing dispute over rent and other habitability matters typical of a sour landlord-tenant

---

in Encyclopædia Britannica (2009) available at http://www.britannica.com/EBchecked/topic/291932/Intracoastal-Waterway.

[3]  The phrase "necessaries" is a maritime law term used to distinguish those goods and services provided to the vessel and her crew so that she can operate from those goods the vessel will transport in its role as a vessel.  See, e.g., Pavlis v. Jackson, 131 F.2d 362, 364 (5th Cir. 1942).

[4]  The statute provides in relevant part that: "[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner--(1) has a maritime lien on the vessel [and] (2) may bring a civil action in rem to enforce the lien." § 31342(a).

relationship.[5]  (Id.)  To date, it appears that at least one action in state court was abandoned by Plaintiffs shortly after filing a complaint, and at least one mediation session has failed to resolve the conflict.  (Id.)  Plaintiff has now resorted to using a maritime lien to collect on the money it claims it is owed for allowing the floating homes to dock at the marina and for the provision of various services.

Upon reviewing the initial verified complaint alleging the maritime lien, this Court issued warrants for the arrest of the vessels on July 7, 2009 [Docket Item 4].  On July 28, 2009, two of the owners of the floating homes requested a post-arrest hearing [Docket Item 9] which was held two days later.  At the hearing, Defendants objected to the exercise of subject matter jurisdiction in this matter, arguing that the floating homes were not vessels and diversity jurisdiction is also not present.  The Court ordered that the owners be permitted to board and occupy their homes while they remained within the custody of the Court and without prejudice to Plaintiff's in rem claims, and ordered briefing from the parties on the issue of subject matter

---

[5]  The owners of the floating homes are herein referred to as Defendants, even though the actual defendants in this in rem action are the homes themselves.  These owners are: Margarette Burroughs (A 1980 CARLCRAFT HOUSEBOAT, HULL ID NO. LMG37164M80D); Jennifer Patterson (A 1980 CARLCRAFT HOUSEBOAT, HULL ID NO. LMG37174M80E); Scott and Lisa Chernack (A 1983 MARINER HOUSEBOAT, HULL ID NO. MZIB30310883); and John Allen (A 1983 MARINER HOUSEBOAT, HULL ID NO. MZIE12074783).

jurisdiction [Docket Item 21].

The threshold question is whether the floating homes constitute vessels for the purposes of § 31342.  Defendants allege that, in addition to the floating homes failing to meet the definition of vessel, the Plaintiff's intent to treat the floating homes primarily as dwellings, and Plaintiff's use (or threatened use) of state law remedies should prevent it from obtaining a maritime lien.

There are four floating homes at issue here: two Mariner floating homes, custom-built elsewhere and towed into place, and two Carlcraft Houseboats, which are mass produced houseboats that have had their means of propulsion removed and were towed to the marina.  All four floating homes are tied to the dock at Sea Village Marina with standard mooring lines, and connected to freshwater, waste water, and electrical systems.[6]  (Pl.'s Br. Supp. Admiralty Juris., 3.)  Plaintiff's marine surveyor alleges that all such connections can be easily removed without special tools.  (Id.)  According to the evidence so far provided to the Court, all four floating homes are indeed floating, at least when the tide is in.[7]  (Id.)  The two Mariner boats were towed through

---

[6]  To the extent that any of these facts are ultimately relevant to the Court's decision on subject matter jurisdiction, the Court is entitled to fact-finding as it sees fit.  See infra Part III.B.

[7]  Counsel for Allen and Patterson maintains that the photos of the craft show that they do not float at high tide, but this

the water to their current location from Mays Landing, New
Jersey.  (Id. at 2.)  Though neither has one installed, both are
built to allow an outboard engine.  (Id.)  While seaworthiness of
the vessels is disputed in the parties' briefs, the only evidence
in the record on the issue of seaworthiness is the affidavit of
Donald Rutherford, attesting that each home is "capable of being
used as a mean [sic.] of transportation on water,"  (Pl's Br.
Supp. Admiralty Juris., Ex-1), plus the fact that each was
constructed to serve as a houseboat.


## II.  DISCUSSION

## A.  Subject Matter Jurisdiction vs. Failure to State a Claim

Initially, the Court must decide whether the question raised
as to the meaning of vessel is a jurisdictional question or a
question going to the merits of Plaintiff's case.  In the context
of federal question jurisdiction, questions over whether a
statutory term applies to the facts at issue are reserved for
decision on the merits.  See Growth Horizons, Inc. v. Delaware
County, 983 F.2d 1277, 1280-81 (3d Cir. 1993).  However, federal
courts have universally treated the question of whether some
craft constitutes a vessel as a jurisdictional question.  See,
e.g., Stewart v. Dutra Const. Co., 543 U.S. 481, 488 (2005); The

---

is not obvious to the Court in looking at the photographs and the
Court chooses to rely upon the affidavit of Plaintiff's marine
surveyor that the crafts float at high tide.

Hercules Co v. Brigadier General Absolom Baird, 214 F.2d 66, 68 n.1 (3d Cir. 1954).

The distinction in treatment may exist because the word vessel is not just part of the statutory cause of action; the fact that the object of the action is a vessel is the reason Congress granted federal courts jurisdiction over the issue.  The word vessel in the maritime lien statute is similar to the requirement of scope of employment in the Federal Tort Claims Act (FTCA) discussed in CNA v. U.S., 535 F.3d 132 (3d Cir. 2008).  In CNA, the court held that questions about whether certain conduct was within an employee's scope of employment were properly handled as jurisdictional questions under the FTCA, even though it is the kind of question that would normally be reserved for the decision on the merits.  Id. at 145.  The Court found that the distinction between jurisdiction and merits under the FTCA was different from the distinction applied in normal federal question jurisdiction because the FTCA directly grants jurisdiction (by waiving sovereign immunity) in a way that ordinary statutes providing jurisdiction pursuant to § 1331 do not.  Id.  The requirement that the subject of a maritime lien be a vessel is closely analogous to the scope of employment requirement in the FTCA, since it is integral to the rationale for granting federal jurisdiction over the claims.

Because of the overwhelming precedent treating this issue as

one of jurisdiction, and because of the rationale in <u>CNA</u>, the Court will evaluate vessel status as an issue of subject matter jurisdiction.

**B.  Standard of Review**

The standard of review for a challenge to subject matter jurisdiction depends on whether the challenge is a facial or factual attack on the Court's jurisdiction over the complaint. If it is the former, the Plaintiff is entitled to have the allegations in the complaint taken as true for the purposes of testing jurisdiction; if it is the latter, the Court becomes a jurisdictional fact-finder and the burden of persuasion is on the Plaintiff.  <u>See, e.g.</u>, <u>CNA v. U.S.</u>, 535 F.3d 132, 145 (3d Cir. 2008).

The question of whether these floating homes are vessels is a mixed question of fact and law, with both in dispute.  Since the facts are at least partly in dispute, the Court will treat the jurisdictional issue as a factual attack.

Because the jurisdictional issues are intertwined with the merits, "less in the way of jurisdictional proof than would be appropriate at a trial" is required.  <u>Id.</u> at 144.  Thus, some doubts about whether Plaintiffs can show by a preponderance of evidence on the merits that the floating homes are vessels will not necessarily preclude the Court from having subject matter

jurisdiction.

## C.  The Definition of Vessel

The United States Code helpfully defines vessel for almost all purposes in maritime law, stating, "In determining the meaning of . . . any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one . . . [t]he word 'vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3.  See Stewart v. Dutra Const. Co., 543 U.S. 481, 488 (2005) ("Even now, § 3 continues to supply the default definition of 'vessel' throughout the U.S. Code, 'unless the context indicates otherwise.'") (citing 1 U.S.C. § 1).  The section "requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel. It does not require that a watercraft be used primarily for that purpose." Stewart, 543 U.S. at 495.

The key phrase is "capable of being used as a means of transportation on water."  Understanding this phrase turns on what is meant by "capable" and what qualifies as "transportation on water."

"Transportation on water" is a straightforward requirement. Often the thing being transported is not a shipment of goods or

passengers but the superstructure itself, and the vessel need not have propulsion or steering — it need do little more than float, be seaworthy enough to be towed in the navigable waters, and have a superstructure.  See, e.g., Board of Com'rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299 (11th Cir. 2008) (holding a casino boat to be a vessel because she "was capable of moving over water, albeit to her detriment, and was capable of being transported under tow"); Holmes v. Atlantic Sounding Co., 437 F.3d 441 (5th Cir. 2006) (holding a structure that was "totally incapable of self-propulsion" to be a vessel); United States v. Templeton, 378 F.3d 845, 852 (8th Cir. 2004) (holding that inoperable engines were insufficient to destroy the vessel status of a floating restaurant); Gulfport Shipbuilding Corp., 221 F.2d 621 (5th Cir. 1955) (holding that a ship without propellers, crew, power, engines, or keel that was moored to a dock by steel cables and ropes and received telephone and electric lines was nevertheless a vessel because "[I]t was afloat . . . [I]t was towed . . . It had a deck; it had cabins, it had superstructure").

The definition of "capable" is more complicated.  It is not sufficient that the craft be theoretically capable of transportation on the water, though that is a necessary element. The craft's use as a means of transportation on water must be a "practical possibility."  Stewart, 543 U.S. at 496.   Numerous

10

structures could, theoretically, be placed into the navigable water and used for transportation.  But these structures

> may lose their character as vessels if they have been withdrawn from the water for extended periods of time. . . . A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail.  The question remains in all cases whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one.

Id.  Thus, assuming the structure is still physically capable of being used for transportation on the water, the question is whether the nature of its removal from active use for transportation has foreclosed the practical possibility of its future use for transportation.

Federal courts only rarely find that a floating watercraft capable of being towed has lost its status as a vessel.  Fifth Circuit Judge John R. Brown, who was an admiralty lawyer in private practice before his appointment, famously quipped that "No doubt the three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale."  See Burks v. American River Transp. Co., 679 F.2d 69, 75 (5th Cir. 1982).  In Stewart, the Supreme Court discussed two cases in which structures were found not to be vessels despite their ability to transport things by floating and being towed in the water.  Stewart, 543 U.S. at 493-94.  The first is the case of the Vallette Drydock.  See Cope v. Vallette

Dry-Dock Co., 119 U.S. 625 (1887).  A drydock is a structure used to repair ships by placing them on the structure and lifting them out of the water. The Vallette Drydock at issue in Cope consisted of a floating platform that was permanently moored by means of large chains and sparred off from the bank.  Id. at 627.  In Cope, because the drydock was "moored and lying at the usual place it had occupied for the past 20 years . . . the drydock was a fixed structure that had been permanently moored, rather than a vessel that had been temporarily anchored." Stewart, 543 U.S. at 493 (citing Cope, 119 U.S. at 626-27).

The second example involves a wharfboat secured to the shore by four or five cables used to store freight and transfer it to and between steamboats.  See Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19, 21 (1926).  In that case, the Court held that it was not a vessel, reasoning that "[l]ocal water, electricity, and telephone lines all ran from shore to the wharfboat, evincing a permanent location . . . [a]nd the wharfboat, like the drydock in Cope, was neither taken from place to place nor used to carry freight from one place to another." Stewart, 543 U.S. at 493 (citing Evansville & Bowling Green Packet Co., 271 U.S. at 22).

In addition to these cases cited by Stewart, there are a few dozen federal cases grappling with the definition of vessel in the context of a craft that is currently floating and can be

12

towed but that is moored in place.  Though each case examines the
totality of the circumstances to determine whether the craft
remains a vessel, a common thread unites them.  The key factor in
cases finding that a craft has lost its vessel status is that the
former vessel (if not removed from the navigable waters entirely)
be moored in such a way as to make immediate egress to navigable
waters not a practical possibility.  Cf. Cope v. Vallette
Dry-Dock Co., 119 U.S. 625, 627 (1887) (moored by steel chains
and surrounded by spars); Pavone v. Mississippi Riverboat
Amusement Corp., 52 F.3d 560 (5th Cir. 1995) ("The first level of
the BILOXI BELLE was connected to the pier by steel ramps, and
the second level was joined to a shore-side building. In
addition, numerous shore-side utility lines . . . were connected
permanently (or at least indefinitely) to the BILOXI BELLE."); In
re Silver Slipper Casino Venture LLC, 264 Fed.Appx. 363, 365 (5th
Cir. 2008) ("The casino was mounted on a steel barge moored to
six steel dolphins using heavy "H" beams.") Martin v. Matt
Canestrale Contracting, Inc., No. CIV.A.08-303, 2009 WL 3154417,
at *15 (W.D. Pa. Sept. 16, 2009) "[T]he key is whether the
removal of the spud that affixes the barge to the river bed is
practical.").  Such permanent connection may include a connection
to utilities that cannot be easily removed, cf. Stewart, 543 U.S.
at 493 (citing Evansville & Bowling Green Packet Co., 271 U.S. at
22).  Unsurprisingly, the actual nature of the mooring — whether

the connection to the shore is permanent or otherwise impractical to sever at short notice — is at the heart of what it means to be "permanently moored" in a way that prevents the "practical possibility" of transportation on water.[8]

## D.   The Floating Homes are Vessels Unless Permanently Moored

Every court to have considered the question has found floating homes to be vessels.  In 1968, the Fifth Circuit Court of Appeals faced a similar question to the one faced by this Court, whether a houseboat could be subject to a maritime lien.  The court reasoned as follows:

> A houseboat is nonetheless a boat because, as its name implies, it affords a water-borne place to live with the added advantage of at least some maritime mobility.  That she has no motive power and must, as would the

---

[8]  This understanding of the case law on permanent mooring is consistent with the Coast Guard's interpretation of the law in its regulations for certification of vessels.  See Craft Routinely Operated Dockside, 74 Fed. Reg. 21814-02 (May 11, 2009).  It determining whether a craft has lost its vessel status, the Coast Guard asks:
• Is the craft [. . .] in a "moat" with no practical access to navigable water?
• Is the craft affixed to the shore by steel cables, I-beams or pilings, or coupled with land based utility connections for power, water, sewage and fuel?
• If the craft were operated in navigation, would it be thereby endangered because of its construction?
• What is the purpose, function, or mission of the craft?
• Can the craft get underway in less than eight (8) hours?
Id.

> most lowly of dumb barges, be towed does not deprive
> her of the status of a vessel.

Miami River Boat Yard, Inc. v. 60' Houseboat, 390 F.2d 596, 597

(5th Cir. 1968).  See also Colonna's Shipyard, Inc. v. U.S.A.F.

GENERAL HOYT S. VANDENBERG, 584 F.Supp.2d 862 (E.D.Va. 2008)

(citing Miami River Boat and noting its consistency with

prevailing federal precedent).

Relying on Miami River Boat, in Hudson Harbor 79th St. Boat

Basin, Inc. v. Sea Casa, 469 F.Supp. 987 (S.D.N.Y. 1979), the

court held that a houseboat berthed at a marina was subject to

maritime lien, stating that "it is clear that a floating

houseboat capable of being towed from one location to another is

a vessel within the admiralty and maritime jurisdiction of this

Court. . . .  It is not a house or apartment, and the contentions

to the contrary asserted by claimant Boldt are without legal

basis."  Id. at 989.[9]  The court relied primarily on the fact

that the houseboat in question could be towed to a different

location, adding, "[t]hat the front of the Marina was protected

from floating ice by camels which prevented egress from the slip

is of no consequence.  These could be moved, and the SEA CASA

could have been towed from her berth during the winter season."

---

[9]   The vessel in that case, SEA CASA, was "a 35 foot
fiberglass houseboat built in 1971. . . . [T]he SEA CASA was
berthed at the 79th Street Marina in the Hudson River, operated
by plaintiff as a public wharf, under a lease or concession
agreement from the City of New York, which fixes the charges for
dockage and marine services."  Id. at 988.

Id.

These cases provide somewhat persuasive and certainly uncontradicted precedent that, at least absent permanent mooring, a floating home can be a vessel.[10]  The cases are also consistent with this Court's understanding of the Supreme Court and other Circuit's guidance on this issue.  Because a floating home floats and can, as a practical possibility, be towed to move the owner's home to a new marina, it is a vessel unless it has been permanently moored.

The arguments made by Defendants on this point are unavailing.  Defendants argue that the boat in Sea Casa was fully functional, and therefore the case is distinguishable.  But there is no indication in the case that the boat was fully functional, and the court certainly did not rely on that fact in its reasoning.  Sea Casa, 469 F.Supp. at 989 ("[I]t is clear that a

_____

[10]  Plaintiff urges the Court to rely upon Bass River Associates v. Mayor of Bass River Tp., 573 F.Supp. 205 (D.N.J. 1983) aff'd by 743 F.2d 159 (3d Cir. 1984) ("[T]he Court Finds and Orders that the floating homes, subject matter of the litigation, are vessels for purposes of applying discussions of Admiralty Law.")  It is not entirely clear from the published record whether the district court found that the floating homes were vessels, or whether the parties stipulated to this fact for the purposes of the court's ruling on the subject of preemption. See 743 F.2d at 161 n.2 ("The parties agree that appellants' boats are 'vessels' for most purposes, as the district court acknowledged in its pretrial opinion.").  Either way, the finding was not part of the court's holding because "the boats' status as vessels is irrelevant except to establish the applicability of the licensing statutes," and the court held that those statutes did not preempt the local statute at issue.  Id.

16

floating houseboat <u>capable of being towed</u> from one location to another is a vessel within the admiralty and maritime jurisdiction of this Court.") (emphasis added).

Defendants also focus on various state laws, regulations, private agreements, and dictionary definitions purporting to identify the floating homes as something other than vessels. Such definitions are irrelevant because they do not purport to define vessel as used in the federal statute.  A craft may be a vessel according to some criteria and not others.  To the extent that any of these state or private definitions of vessel did purport to define the term for the purposes of the federal statute and conflict with the federal statute's definition, they would be pre-empted under the Supremacy Clause.  <u>See, e.g.</u>, <u>Home Warranty Corp. v. Elliott</u>, 572 F. Supp. 1059, 1065 (D. Del. 1983) ("That section provides a definition . . . which makes no reference to state law.  This federal definition necessarily preempts any state definition.  If this were not so, a state could . . . thwart the intent of Congress.").  For the same reason, the fact that the floating homes were covered by marine insurance is also not probative evidence on the question of whether these floating homes constitute vessels under the federal definition (although it suggests that their use as transportation on the water may be marginally more practical than without such insurance.

Along similar lines, Defendants argue that the lack of Coast Guard certification of the floating homes is relevant to whether the Court should consider them vessels.  A craft's status as a vessel does not depend on whether the craft happens to currently be certified by the Coast Guard.  See The Hercules Co v. Brigadier General Absolom Baird, 214 F.2d 66, 69 (3d Cir. 1954) ("We think, however, that the presence or absence of complete documentation, important as it may be for many other purposes, does not of itself determine whether a floating object is or is not a vessel subject to admiralty jurisdiction."); Board of Com'rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299, 1311-12 (11th Cir. 2008) ("[I]f legal navigability is the test for vessel status, any ship with an expired Coast Guard certification becomes a non-vessel, and those working upon it and around it lose their protection under the Jones Act or the LHWCA. Such a result is clearly not what the Supreme Court intended.").  Perhaps a Coast Guard determination about the floating homes would be granted Chevron deference,[11] depending on the nature of the finding.  But there is no evidence presented here that the Coast Guard has found that the floating homes are not vessels, or that they could not receive the necessary credentials to be towed to a new marina.  On the contrary, these craft are very likely

_____

[11]   See generally Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

18

vessels according to the Coast Guard regulations, see supra note 8, and the Coast Guard appears to have assigned the hull identification numbers that identify the crafts in this action. One may assume the regularity of governmental actions taken in the normal course; there is no reason to think that the Coast Guard would assign a hull identification number to an object that is not thought to be a vessel.

The fact that a floating home may be a vessel does not mean that these floating homes are vessels. The category "floating home" is broad, from fully-functional yachts designed with long-term living quarters to crafts resembling trailers on floating platforms. It may include some things that are vessels and others that are not. And even if these floating homes share the same relevant characteristics as those at issue in the other cases, a floating home, like any other vessel, can lose its status as a vessel under the right circumstances of permanent mooring.

Here, the floating homes at issue are sufficiently like those at issue in Miami River Boat and Sea Casa. According to the available evidence, they float and can be towed to a new marina without substantial effort beyond obtaining a towing craft and making the typical preparations for such a journey. These are the critical factors. There is little doubt that if the craft at issue in this case were routinely towed to new marinas

19

for their occupants to enjoy, the Court would be compelled to consider them vessels.  That these homes are capable of readily being towed is apparent from the facts.  The only remaining question for this Court, then, is whether the houseboats lost their status as vessels because of the circumstances of their mooring.

**E.  The Floating Homes Are Not "Permanently Moored"**

As stated previously, in nearly every case in which a federal court has found that a vessel has lost its vessel status, it was moored in a manner more permanent than standard mooring lines.  This factor is missing for all the crafts at issue here.

The two Carlcraft boats appear to be moored with nothing more than standard lines tied to cleats on the boats.  And the two Mariner houseboats are moored by attaching similar line to a shackle on the craft.  While the ship-to-shore utilities connections can potentially cause a craft to be permanently moored, this depends on the nature of the connections.  Plaintiff's supporting affidavit attests that the utilities can be disconnected without special tools at any time.  (Rutherford Decl., ¶¶ 2A & 2B.)

Looking beyond the nature of the ship-to-shore connections, as far as this Court has been made aware, there is no physical characteristic of the floating homes in their capability of being

20

towed or in any other respect that would distinguish them from the vessels in the houseboat cases.

Defendants argue that the intentions and expectations of the parties suggest that the floating homes at issue here should be considered permanently moored.  The floating homes are part of a planned community that is in many respects like an apartment complex (complete with swimming pool), but with the owners of the floating homes renting dockage and having no ownership interest in the docks, moorings, and land-based amenities.  Communications between the marina and the occupants discuss long-term plans and how they will be collectively paid for, perhaps evincing intentions that the marina be more than a temporary dock for houseboats that happen to be visiting Atlantic City.[12]

_____

[12]   Defendants also contend that their agreements with the marina are basically a lease, and contain a clause requiring New Jersey State Law to govern the agreement.  As a general legal principle, it is possible for an action that would otherwise be subject to admiralty law to be governed by state law because of a contractual choice-of-law provision, which would in effect be a forum selection clause.  See generally New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24 (2d Cir. 1997) (allowing the possibility that a forum selection clause may be cause to remand an admiralty case to state court).  However, it is not clear from the complaint in what year the owners' alleged obligations arose and thus which agreement governs, and the only signed agreement Defendants are able to produce is one occupant's agreement from 2004 (though they produce what appear to be unsigned standard lease forms which also contain the language).  At this stage, Defendants' arguments are simply insufficient: they have not demonstrated that the dispute arises from a signed contract with the relevant language, that the choice-of-law language would apply to a dispute arising from the contract (as opposed to construing the contract itself), and they have offered little more than a few sentences of argument on the topic.

Further, as Defendants point out, the NJDEP, in regulating this waterside development, has required that if an existing floating home vacates its space, another one cannot take its place.  (Def.'s Allen & Patterson Br. Opp. Admiralty Juris., Ex-A).  This suggests that the Plaintiff may also have an expectation that these floating homes are permanent.

There is a split of authority on the issue of whether such factors should be considered, and the Third Circuit has not yet decided the issue.  Compare De La Rosa v. St. Charles Gaming Co., 474 F.3d 185, 187 (5th Cir. 2006) ("Defendants do not intend to use it as such. Rather, their intent is to use it solely as an indefinitely moored floating casino.") and Tagliere v. Harrah's Ill. Corp., 445 F.3d 1012 (7th Cir. 2006) (suggesting but not deciding that a boat may be permanently moored when its owner intends that the boat will never again sail) with Board of Com'rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299 (11th Cir. 2008) ("The owner's intentions with regard to a boat are analogous to the boat's purpose, and Stewart clearly rejected any definition of 'vessel' that relies on such a purpose.") and Colonna's Shipyard, Inc. v. U.S.A.F. GENERAL HOYT S. VANDENBERG, 584 F.Supp.2d 862, 870 (E.D. Va. 2008) (agreeing with Belle).

In the case In re Queen Ltd., 361 F.Supp. 1009 (E.D. Pa. 1973), Judge Gorbey wrote that:

> Rather than having the existence of a lien depend on
> the ethereal quality of the owners' intent to use the

> ship in commerce and navigation, more uniform results
> are likely to be achieved . . . [if] the existence of a
> lien is dependent upon the degree of permanence of the
> attachment of the structure to the land.

Id. at 1013.  The rationale in In re Queen rings true today.

Holding the intent of the owners irrelevant and focusing on

objective characteristics is not only useful for the purpose of

uniformity, but also because the question is ultimately whether

the beliefs and expectations of the parties can alter the

"practical possibility" of the craft's "use as a means of

transportation on water."  Stewart, 543 U.S. at 496.  The Court

is mindful that the word ultimately being defined by all of this

case law is the statute's term "capable."  The word "capable" is

often used to contrast ability from intention.  It would seem a

rather odd definition of capable that would allow it to apply or

not apply depending on mere plans and expectations, which are

always subject to change.[13]  Therefore, this Court sides with the

---

[13]  One might view Defendants' arguments about intentions
and expectations as an argument for some kind of estoppel,
requiring the Court to reject subject matter jurisdiction
regardless of whether the homes are, according to the statute,
vessels.  See, e.g., Minard v. ITC Deltacom Commc'ns, Inc., 447
F.3d 352, 358-59 (5th Cir. 2006) (holding that where defendant
represented that plaintiff was an "eligible employee" under FMLA,
even though she was not, equitable estoppel doctrine may apply).
They argue that Plaintiffs have previously treated this matter as
a housing dispute governed by state law, and therefore should not
now be able to litigate it as a federal admiralty matter.  Even
if some theory of equitable estoppel could apply here, there is
no evidence in the record that Plaintiff has represented to
Defendants or anyone else that the floating homes are not vessels
for the purposes of admiralty jurisdiction.  Critically,
defendants have not made any showing that they reasonably relied

23

Eleventh Circuit in finding that such intentions cannot be used as evidence on the question of practical possibility.

Because there is nothing about the physical nature of the floating homes' mooring that makes them permanently moored, they retain their status as vessels for the purpose of a maritime lien.

III.  **CONCLUSION**

One purpose of the maritime lien is to prevent ships from escaping their debts by sailing away. See Trans-Tec Asia v. M/V HARMONY CONTAINER, 518 F.3d 1120, 1128 (9th Cir. 2008).  In the end, this Court finds that the possibility that these houseboats may "sail" away is not especially remote or theoretical.  If the Court's assessment of the practical ability of these vessels' owners to move them at will is incorrect, based upon a single affidavit as it is, the Defendants will have the opportunity to correct this by offering further evidence at later stages of this litigation because the issue of vesselhood is also a matter critical to the merits.  The decision on subject matter

---

on such alleged statements.  Without these basic elements of an estoppel defense, there is no reason why Plaintiff's earlier treatment of the issue as a housing dispute should prevent them from asserting a maritime lien.  No court has actually ruled upon the merits of this issue, so there is no question about res judicata or collateral estoppel.  To the extent that any settlements have been entered over the money in controversy, that is a question that goes to the question of whether there is any amount owed.

jurisdiction based on a more limited evidentiary record than a decision on the merits does not foreclose a later finding, once more evidence is marshaled, that the floating homes are not vessels.

In any event, the Court finds it has admiralty jurisdiction over the present dispute under 28 U.S.C. § 1333.  The accompanying Order is entered.


**October 19, 2009**                              **s/ Jerome B. Simandle**
Date                                              JEROME B. SIMANDLE
                                                  U.S. District Judge