IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
────────────────────────────
                            :
SEA VILLAGE MARINA, LLC,    :
                            :
            Plaintiff,      :      Civil Action
                            :      No. 09-3292 (JBS-AMD)
       v.                   :
                            :
A 1980 CARLCRAFT HOUSEBOAT, :      OPINION
HULL ID NO. LMG37164M80D, et:
al.,                        :
                            :
            Defendants.     :
                            :
────────────────────────────
```

APPEARANCES:

Daniel Harold Wooster, Esq.
Michael Barry McCauley, Esq.
PALMER, BIEZUP & HENDERSON, LLP
330 Market Street
Camden, NJ 08102-1524
     Counsel for Plaintiff

Eric J. Goldring, Esq.
GOLDRING & GOLDRING, P.A.
2 Bridge Avenue
Suite 634
Red Bank, NJ 07701-5622
     Counsel for Hull IDs LMG37174M80E & MZIE12074783

Linda L. Campbell, Esq.
KEARNEY & ASSOCIATES, P.C.
210 White Horse Pike
P.O. Box 279
Haddon Heights, NJ 08035
     Counsel for Hull ID NO. MZIB30310883

Margarette Burroughs, Pro Se
P.O. Box 209
Richland, NJ 08350
     and
Stuart Wolf, Pro Se
2312 New Road
Northfield, NJ 08225
     For Hull ID NO. LMG37164M80D

**SIMANDLE**, District Judge:

## I.  INTRODUCTION

This admiralty matter involving the enforcement of alleged maritime liens is before the Court upon Defendants' motion for a post-seizure hearing [Docket Items 9 & 10].[1]  Having conducted the post-seizure hearing pursuant to Supplemental Rules for Admiralty or Maritime Claims E(4)(f) and D.N.J. Local Admiralty Rule (e)(8), the Court must determine whether Plaintiff has demonstrated reasonable grounds for the arrest of the four subject vessels.

## II.  BACKGROUND

Plaintiff, Sea Village Marina, operates a community of

---

[1] After this Court's opinion finding admiralty jurisdiction (see Opinion filed Oct. 19, 2009, Docket Item 29), Scott and Lisa Chernack (A 1983 MARINER HOUSEBOAT, HULL ID NO. MZIB30310883), and Margarette Burroughs and Stuart Wolf (A 1980 CARLCRAFT HOUSEBOAT, HULL ID NO. LMG37164M80D) stipulated that some money is owed to Plaintiffs for the provision of necessaries, and those defendants were therefore excused from the third and fourth hearings on whether some amount is owed to Plaintiff entitling it to maritime liens.  The accompanying Order will be entered finding Plaintiff has demonstrated reasonable grounds for the arrest of the Chernack and Burroughs vessels.  Vessel owners John Allen (A 1983 MARINER HOUSEBOAT, HULL ID NO. MZIE12074783) and Jennifer Patterson (A 1980 CARLCRAFT HOUSEBOAT, HULL ID NO. LMG37174M80E) have not so stipulated, and raise the arguments addressed in today's opinion.  As in the opinion on admiralty jurisdiction, the owners of the floating homes are herein referred to as defendants, even though the actual defendants in this in rem action are the vessels themselves.  For brevity, when the Court refers to Defendants in this opinion, it is referring to Defendants Allen and Patterson.

floating homes in Egg Harbor Township, New Jersey.  The vessels
involved in this action have occupied the slips at which they are
currently moored for many years, but recent years have been
somewhat tumultuous.

On February 28, 2007, Egg Harbor Township passed a revision
of its rent control ordinance applying it to the marina's
agreements with the owners of the floating homes.  Egg Harbor
Township Code, Rent Review, § 180-1.[2]  A few weeks after the rent
control ordinance was revised, apparently believing that it could
set the baseline dockage fee under the ordinance, Sea Village
Marina issued notices to the vessel owners that their agreements
with the marina would be terminated and that a new, much higher
dockage rate would go into effect.[3]  (Pl.'s Ex-5, at 1.)

According to the notice, the marina was already experiencing
financial troubles and it feared that the rent control would only

_____

[2]  An electronic version of the Egg Harbor Township Code is
available at http://www.ecode360.com/?custId=EG0915.

[3]  There is no evidence in the record that the vessel owners
actually received these notices in 2007.  Exhibit P-5 indicates
that Allen received something on July 13, 2009, but the article
number of the certified mail receipt is obscured so it is not
clear whether it was the notice (Pl.'s Ex-5, at 2-3).  Exhibit P-
6 shows that someone named Catherine Hammel (Patterson's
grandmother, according to the testimony of Ms. Beverly Cox)
received the notice sent to Patterson, but the receipt shows no
date (Pl.'s Ex-6, at 2).  Exhibit P-7 shows that Lisa Chernack
signed for delivery of the notice on March 17, but the year is
obscured (Pl.'s Ex-7, at 2).  And Exhibit P-8 shows that someone
named Tom Martin was sent the notice for the Burroughs vessel
(Pl.'s Ex-8, at 2).

exacerbate the problem.  (Id.)  The notice indicates that the rate being billed at the time was $633.75 per month, and that the new rate would be $1,165.25.[4]  (Id.)

The attempted increase did not have the intended effect. Sea Village bookkeeper Beverly Cox testified that in April 2007, the manager of Sea Village, Patricia Best, resigned from her position, and an interim administratrix, Barbara Lieberman, took over on May 25, 2007.[5]  (Third Hearing Tr. 27:8-17, 33:23-34:1, November 24, 2009.)  Lieberman instructed Cox to bill the dockage at a rate of $633.75 per month, instead of the rate in the notices to quit, in an effort to resolve an ongoing "rent strike."  (Id. at 27:8-17, 33:23-34:1.)  Cox testified that Defendants were billed $633.75 for dockage from May 2007 until August 2009.  (Id. at 27:21-24.)

Lieberman's plan to end the rent strike by billing the dockage at $633.75 instead of the higher notice to quit rate was also unsuccessful.  In June 2007, the marina's lease from the State of New Jersey to occupy the tidelands upon which it sits expired, (Def.'s Ex-10), apparently because the marina could not

---

[4]  The rates for the Chernack vessel are slightly different, but the increase is of a similar proportion.

[5]  Beverly Cox was the bookkeeper for Sea Village from 2004 to January 20, 2008 and part-time employee since September 2008 (First Hearing Tr. 1:7-13, July 30, 2009).

afford to pay the licensing fees for renewal.[6]  On July 13, 2007, the vessel owners occupying 32 slips, including Defendants, entered into an agreement with the marina according to which dockage fees would be paid into an escrow until a new well was built for the marina.  (Def.'s Ex-4.)  The terms of the "Agreement As To Rent Dispute" provided that the dockage fee was to be set at $600 (with a $100 credit until the problems with the water were remedied) for the period from May 2007 through July 2008.  (Id.)  Each month, half of the dockage payment (i.e. $250) was to be released to the marina.  (Id.)

According to Cox, despite the agreement, the vessel owners continued to be billed for dockage at a rate of $633.75, of which no portion was paid including no payments of $250 per month according to the rental agreement.  (Third Hearing Tr. 55:15-18, November 24, 2009.)  Cox testified that no portion of the dockage owed since December 1, 2006 for the Allen vessel and May 21, 2007 for the Patterson vessel has been paid to the marina.  (Id. at 14:2-12.)  Plaintiff has not produced any signed dockage agreements or any invoices covering the relevant period.[7]

---

[6]  The legal effect of this expiration is discussed below in Part III.B.5.

[7]  The Court has copies of dockage agreements from 2004 on which someone has written the names of Allen and Patterson, though the Allen agreement is unsigned.  The Court has unsigned 2007 agreements which have a printed sticker with the names of Allen and Patterson.  And the Court has an unsigned 2006 agreement on the top of which Allen's name has been written, but

Ms. Cox did testify that $500 from the escrow was distributed to an attorney to draft a new dockage agreement. (Id. at 58:7-10.)  She also said that "[t]here was another distribution of a little over $20,000 early on . . . in July of 2007." (Id. at 58:7-23.)  However, no part of the $20,500 of distributed escrow funds was credited to any of the tenants because the attorney managing the escrow "did not give [the marina] any kind of a breakdown on where to apply, he didn't tell us who paid how much, what portion of it should be applied to any tenant." (Id.)  The Court has not been provided any evidence by which it could accurately apportion it to the tenants.[8]

In May 2008, Sea Village, by then under the management of Bill Garry, brought actions in state court for non-payment of rent against Allen, Patterson, and three others. (Def.'s Br. Opp. Admiralty J., Ex-D.)  The dockage rate alleged in the state

_____

it is also unsigned.  (Defs.' Ex-5 through 9.)

    [8]  The Court is satisfied, however, that whatever credit the contesting Defendants are entitled to does not exceed the amount owed.  Assuming that all 32 tenants, including Allen and Patterson, paid into the escrow before the release of funds and paid the same amounts, then Allen and Patterson would each be entitled to credit for 1/32 of the distribution, or $640.62. Divided over the 24 months between July 2007 when the agreement was created and July 2009 when this action was initiated, this comes out to $26.69 per month.  Even if the assumption that all of the tenants paid into the escrow is incorrect, some substantial number must have paid into it in order to accumulate $20,500 in such a short period.  Therefore, whatever credit Defendants are entitled to does not exceed what is owed to the marina, even if the owed amount is substantially reduced from the amount agreed to in the escrow agreement.

court documents was $633.75.  (Id.)  For unknown reasons, the
marina did not pursue these actions and they were dismissed for
lack of prosecution on March 10, 2009.[9]  Sea Village Marina, LLC
v. Patterson, Docket No. C-121-08 (N.J. Sup. Ct. March 10, 2009)
(attached in Def.'s Br. Opp. Admiralty J., Ex-D.).

This brings us to June 2009 when the new owner of Sea
Village, Thomas Martinolich, embarked on a novel approach to the
problem of the rent dispute: maritime liens.  Shortly after he
took over on June 16, according to Cox, he instructed Cox to edit
the computer data in the bookkeeping software to retroactively
reflect the dockage fee proposed in the notices allegedly sent to
the vessel owners in March 2007, namely $1,165.25, rather than
the dockage fee that was actually billed to the residents of Sea
Village, namely $633.75.  (Third Hearing Tr. 30:17-32:19,
November 24, 2009.)  On July 7, he filed the present action in
rem pursuant to 46 U.S.C. § 31342 to enforce maritime liens on
four of the floating homes as the result of the delinquent
dockage payments.  Cox tabulated the amounts due for the Verified
Complaint based on the computer data she had been instructed to
revise upward.  (First Hearing Tr. 1:19-2:10, July 30, 2009.)

On July 7, 2009, Plaintiff filed its Verified Complaint in

---

[9]  Ms. Campbell, counsel for Lisa and Scott Chernack,
alleges that Garry was fired in the fall of 2008 for embezzling
large amounts of money from the marina.  (Defs.' Chernack Br.
Opp. Admiralty J., at 8.)

rem against the four vessels, asserting claims arising under the maritime lien statute, 46 U.S.C. § 31342(a), invoking the Court's admiralty jurisdiction to collect unpaid houseboat dockage fees. These claims asserted the amounts of $49,130.59 as to the Allen Vessel and $44,117.47 as to the Patterson Vessel.  [Verified Complaint ¶ 12, Docket Item 1.]

Upon reviewing the Verified Complaint, this Court issued warrants for the arrest of the vessels the same day the complaint was filed [Docket Item 4].  On July 28, 2009, two of the owners of the floating homes requested a post-arrest hearing [Docket Item 9] which was held two days later.  At that first hearing on July 30, 2009, Plaintiff entered into evidence for each vessel a document described by Cox as an "internal statement of the account showing all of the open invoices."  (First Hearing Tr. 2:12-19, July 30, 2009.)  Cox testified that these statements were the records she consulted to calculate the dockage owed, and that they were kept in the ordinary course of business.  (Id. at 2:3-10.)  In fact, according to Cox's later testimony, the statements were produced based on the data that was edited in advance of this litigation in June 2009 to retroactively reflect the higher amounts — amounts that were not actually billed. (Third Hearing Tr. 30:17-32:19, November 24, 2009.)  The apparent falseness of this documentation, and the overstatement of Plaintiff's lien claim, are discussed below in Part III.B.1.

8

At this first hearing, Defendants made a number of objections to the seizure, including objections to the exercise of subject matter jurisdiction in admiralty in this matter, arguing that the floating homes were not vessels.  It became clear to the Court that some discovery would be needed in the case, and the Court ordered that the owners be permitted to board and occupy the homes while they remained within the custody of the Court and ordered limited discovery [Docket Item 19] and ordered briefing from the parties on the issue of subject matter jurisdiction [Docket Item 21].

The second hearing, on October 9, 2009, was focused on the threshold question of whether these floating homes constituted vessels for the purposes of admiralty jurisdiction.  In a written opinion of October 19, 2009, the Court determined that it had admiralty jurisdiction over the matter based on the seaworthiness of the vessels and their lack of permanent mooring.  Sea Village Marina, LLC v. A 1980 Carlcraft Houseboat, Hull ID No. LMG37164M80d, Civil Action No. 09-3292 (JBS-AMD), 2009 WL 3379923 (D.N.J. October 19, 2009) (entered as Docket Item 29).[10]

After finding that it had admiralty jurisdiction, the Court

_____

    [10]  The Court concluded by noting that "the decision on subject matter jurisdiction based on a more limited evidentiary record than a decision on the merits does not foreclose a later finding, once more evidence is marshaled, that the floating homes are not vessels."  [Docket Item 29, at 25.]  Defendants have not introduced any further evidence on the question of seaworthiness.

held two additional evidentiary hearings on November 24, 2009 and December 10, 2009 to determine whether Plaintiff has demonstrated reasonable grounds for the arrest of the vessels.  It was at the third hearing on November 24, 2009 that the nature of Plaintiff's unorthodox bookkeeping was revealed.  Plaintiff attempted to introduce spreadsheets showing the dockage owed.  While the figures on the spreadsheet had been exported from the marina's computer accounting program, the dockage rates for each month had been edited to reflect the rate applied before the 2007 notices ($633.75).  In other words, the numbers were re-revised to reflect the rates actually charged to Defendants.  Plaintiff's counsel described this as "doing [Defendants] a favor by reducing the amount of the claim."  (Third Hearing Tr. 9:14-15, November 24, 2009.)  The Court admitted these spreadsheets as demonstrative exhibits for the purposes of Cox's testimony, but not as business records since they were not prepared in the normal course of business.

Upon further questioning of Ms. Cox by Mr. Goldring, counsel for Defendants Allen and Patterson, the Court made another discovery.  Not only had the figures on the exported spreadsheet been edited, but as discussed above, the figures in the computer accounting program had also been edited after new ownership took over, and these were the figures summarized on the statements of account submitted to the Court.  (Id. at 30:17-35:13.)

Because a number of the other issues raised by Defendants were still unresolved after the third hearing, the Court issued a second discovery order to facilitate the expedited discovery of matters related to Defendants' arguments about landlord-tenant laws, the Tidelands lease, information about the escrow and the agreement that created it, and any documentation of agreements in place between Plaintiff and Defendants.  [Docket Item 41.]

The fourth hearing, held on December 10, 2009, examined the fruits of this expedited discovery.  Defendants also called Robert Cozen, a marine surveyor, and Defendant John Allen.  Both testified about conditions at the marina.

The Court, having had the opportunity to reflect on the events of these four hearings, now addresses the question of whether Plaintiff has shown reasonable grounds for the arrest of the subject vessels.

## III.  DISCUSSION

### A. Standard of Review

The owners of arrested vessels are entitled to a post-arrest hearing upon their request, in which the "plaintiff shall be required to show why the arrest . . . should not be vacated or other relief granted."  Fed. R. Civ. P. Supp. E(4)(f).  Beyond providing for such a hearing, the federal rules do not inform the

content or form of the hearing.[11]  The Third Circuit Court of Appeals has held that the post-arrest hearing is not intended to resolve the dispute between the parties, but only to make a preliminary determination as to whether there were "reasonable grounds" for the arrest.  <u>Salazar v. Atlantic Sun</u>, 881 F.2d 73, 79-80 (3d Cir. 1989).

The exact scope of the post-arrest inquiry under Supplemental Rule E(4)(f) is not well-defined.  A preliminary hearing need not definitively determine the amount of the lien to which Plaintiff is entitled, which is often the principal subject of dispute.  <u>Id.</u>  However, the hearing is intended to be extensive enough to allow the Court to set the amount of an appropriate bond.[12]  <u>Id.</u> at 79.  Although the post-arrest hearing is supposed to be preliminary, courts commonly consider at the post-arrest hearing all issues relevant to the plaintiff's entitlement to a maritime lien, including whether the services provided were necessaries, whether reasonable compensation was

---

[11]  Local Admiralty Rule (e)(8) briefly addresses this hearing, requiring that "[a]n adversary hearing following arrest . . . be conducted by the Court within three (3) court days after a request for such hearing, unless otherwise ordered."  LAR (e)(8).  The initial hearing was timely convened under this rule, and it was continued for good cause to enable reasonable discovery.

[12]  In this case, the parties stipulated to allowing the vessel owners to occupy their vessels during the pendency of the action.  [Docket Item 16.]  Plaintiff maintains that this eliminates the need to post a bond, and Defendants have not yet sought to do so.

provided for those services, and whether the lien was waived. See, e.g., Newport News Shipbuilding and Dry Dock Co. v. S.S. Independence, 872 F. Supp. 262, 266 (E.D. Va. 1994).

Ultimately, the extent and nature of the post-arrest procedure is a matter of the district court's discretion so long as the constitutional minimum is met. Salazar, 881 F.2d at 80. Given the unique circumstances of this case, involving vessels that are also homes, the Court has permitted a somewhat expansive version of the required post-arrest hearing to provide Defendants with an opportunity to obtain discovery and make any arguments that might result in the immediate release of the vessels. The Court has considered as relevant to the establishment of reasonable grounds for arrest any evidence the parties wished to enter regarding Plaintiff's entitlement to the liens. See S.S. Independence, 872 F. Supp. at 266 ("[P]laintiff must establish that it was entitled to a maritime lien, and that therefore it had reasonable grounds or probable cause to arrest.") To this end, the Court allowed the hearing to be continued three times so that Defendants could conduct discovery and further briefing of issues they alleged to be relevant to the existence of Plaintiff's liens, and generally entertained all arguments going to the question of Plaintiff's entitlement to the liens and

13

reserving only the question of the quantum of each lien.[13]

   This is an _in_ _rem_ action to enforce a statutory lien arising out of the provision of necessaries, as opposed to an _in_ _personam_ action brought on the basis of the marina's dockage agreements. The question of whether Plaintiff is entitled to a maritime lien for necessaries is governed by federal statute.  46 U.S.C. § 31342(a) states in relevant part: "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel [and] may bring a civil action _in_ _rem_ to enforce the lien."  § 31342(a).  This statute displaces the common law governing the creation and enforcement of maritime liens involving the provision of necessaries.  Ventura Packers, Inc. v. F/V JEANINE KATHLEEN, 305 F.3d 913, 917-19 (9th Cir. 2002).  Consequently, an enforceable maritime contract is not required to establish a necessaries lien.  _Id._  Instead, a plaintiff must show: "(1) that plaintiff performed services on the vessel; (2) that charges for those

_____

   [13] The Court's approach to the post-arrest hearing requires that it address some of the key issues in this case before either side has had the opportunity for full discovery.  The Court has sought to mitigate this problem by twice allowing limited discovery, but the nature of a preliminary hearing is that the evidence marshaled in support of the parties' arguments may be less complete than the evidence that could be presented after full discovery.  Nonetheless, the Court sought to give Defendants the opportunity to present what evidence they had or could quickly obtain, so that if that evidence was sufficient at this stage to vacate the arrest, the vessels would not be held in custody any longer than necessary.

services were reasonable; (3) that services were 'necessaries,' as defined by 46 U.S.C. § 31301(4); and (4) that the person who placed the order had the real, apparent or statutorily presumed authority to do so." S.E.L. Maduro (Florida), Inc. v. M/V ANTONIO de Gastaneta, 833 F.2d 1477, 1482 (11th Cir. 1987); S.S. Independence, 872 F. Supp. at 266. See also Ventura Packers, 305 F.3d at 917.

Defendants have not disputed the fact that the vessels have been docked at the marina for some time or that dockage constitutes a necessary. The dispute at this stage is primarily over the marina's ability to lawfully collect the dockage and its power to enforce the lien.

## B. Plaintiff's Ability to Collect Dockage and Enforce Lien

The two contesting Defendants present five areas of argument with regard to Plaintiff's ability to collect dockage and enforce the lien. They contend that Plaintiff's behavior with regard to the editing of the internal bookkeeping statements constitutes fraud and should bar relief; that New Jersey landlord-tenant law bars this action; that the Egg Harbor rent control ordinance forecloses this action; that the vessel owners' escrow agreement constitutes substitute security or resulted in waiver of the lien; and that the expiration of Plaintiff's State Tidelands lease in June 2007 means no amount could be lawfully collected

for dockage.  The Court addresses each argument below.

### 1. Fraud

Because the statements of account submitted to this Court to prove the amount of unpaid dockage were inconsistent with the statements submitted in the 2008 state court action for the same purpose, (Defs.' Ex-11, at 7-10; Pl.'s Ex-5, at 5-6), Defendants have asserted that Plaintiff submitted and relied upon fraudulent materials and that Plaintiff should therefore be barred from enforcing the maritime liens.[14]  (Defs. Allen and Patterson's Br. Opp. Admiralty J., at 11.)  The discrepancy between the statements was eventually explained by Ms. Cox's testimony that the computer data was changed just before this action was filed. (Third Hearing Tr. 30:17-32:19, November 24, 2009.)

District courts possess the inherent power to sanction one "who defiles the judicial system by committing a fraud on the court."  See Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989).  Plaintiff, by Plaintiff's counsel, submitted internal statements "showing all of the open invoices" to this Court.  (First Hearing Tr. 2:12-19, July 30, 2009.)  These statements also formed the basis of the amounts alleged to be

---

[14]  Defendants make other arguments as to fraud, but the Court finds no merit in Defendants' claim that Plaintiff perpetrated a fraud on the court by selectively quoting a case and not identifying another case as being unreported.

owing in the verified complaint signed by Mr. Wooster and verified by Mr. Martinolich.  (First Hearing Tr. 1:19-2:10, July 30, 2009.)  Further, the statements cite invoice numbers and state the "orig. amount" of the invoice.  (E.g., Pl.'s Ex-5, at 4.)  However, according to Ms. Cox, the statements were revised shortly before the filing of this lawsuit and do not reflect the amounts of the invoices sent to Defendants.  Thus, the creation of statements purporting to summarize amounts previously invoiced to Defendants that were in fact wrong, and submitting these incorrect inflated amounts to the Court, may amount to an attempted fraud upon the Court.  Similarly, the elevated sums sought in the Verified Complaint, namely $49,130.59 as to the Allen Vessel and $44,117.47 as to the Patterson Vessel, are apparently false and without support in the actual business records of Plaintiff and its predecessor owners.  Based on this evidence, the Court must inquire whether Plaintiff or Plaintiff's counsel made knowingly false statements to both Defendants and this Court, in the initial statements and the Verified Complaint, in an effort to increase the amounts of its alleged maritime liens.

There is insufficient information in the record upon which to determine whether a fraud has been perpetrated on the Court.  Also, the Court wishes to ensure that Plaintiff and Plaintiff's counsel have due notice of this charge.  The Court will therefore

17

hold a hearing to determine whether Plaintiff or Plaintiff's counsel committed fraud on the Court, or violated any rules of procedure such as Fed. R. Civ. P. 11, and if so what response is appropriate.

The Court is concerned with whether the inflated lien claims in the Verified Complaint and the inflated invoiced amounts claimed in the account statements at the initial post-seizure hearing were knowingly false or otherwise intentionally submitted with the intent to mislead the Court or to defraud the Defendants.  If so, such misconduct may be sanctionable under Rule 11, Fed. R. Civ. P., and/or under the inherent power of the Court.  Such sanctions, if warranted, may include, but not be limited to, the striking of claims, the limitation of claims, the retention of a forensic accountant at Plaintiff's expense, an award of attorney's fees, and/or referral to disciplinary authorities.  The accompanying Order to Show Cause will set the timetable for Plaintiff's submissions, an opportunity for Defendants to respond, and a hearing date in the near future.

Meanwhile, the prospect that some evidence of the claim is false need not delay consideration of the remaining issues raised in this preliminary hearing.  At most, it appears Plaintiff inflated its claimed amounts of dockage fees from $633.75 per month to $1,165.25 per month for each vessel.  Allen and Patterson acknowledged they owe some amount for dockage, as each

18

paid into the escrow account in a monthly amount meeting or exceeding the amount required under the rent dispute agreement. At the least, Plaintiff was entitled to one-half of the escrow amount each month, and perhaps the entire escrow, and Plaintiff received only the equivalent of $26.69 per month from the escrow.[15]  Thus, for purposes of this preliminary hearing, in which the existence of a lien, but not necessarily its quantum, is at issue, Plaintiff has established that the Allen and Patterson vessels have not paid for their dockage, which is a "necessary" under maritime law, even if the original claim set forth in the Verified Complaint was inflated.  In this case, the falsity is material to the amount, rather than the existence of the maritime lien.

### 2.  The Applicability of State Landlord-Tenant Statutes

Defendants cite several New Jersey state laws regulating the relationship between landlords and tenants.  However, these laws are not applicable to this action.

The first such statute requires that landlords register with the state.  N.J. Stat. Ann. § 46:8-28.  It provides that "[i]n any action for possession instituted by a landlord who has failed to comply with the provisions of this act, no judgment for possession shall be entered until there has been compliance." §

---

[15]  See supra note 8 and accompanying text.

46:8-33.  Defendants contend that because Sea Village Marina is
not so registered, no judgment for possession can be entered.

Under this statute, a landlord is one who owns or controls
"any building or project in which there is rented or offered for
rent housing space for living or dwelling purposes."  § 46:8-27.
A project is a "group of buildings" which "stand on a single
parcel of land or parcels of land."  Id. (emphasis added).
"Building" is left undefined.  The general principle is that in
the absence of a definition, a statutory term should be given its
ordinary meaning.  Miah v. Ahmed, 846 A.2d 1244, 1249 (N.J.
2004).  The statutory definition of project and the ordinary
definition of building suggest that homes that float on water are
not buildings for the purposes of § 46:8-27.  Moreover, in other
landlord-tenant statutes, when the New Jersey legislature has
seen fit to apply the statute beyond structures permanently
affixed to the land such as apartments or single-family homes, it
has revised the statute to include broader language.  E.g., Anti-
Eviction Act, N.J. Stat. Ann. § 2A:18-61.1 (discussed below).
The language of the registration statute shows that it does not
apply to this action.

Defendants also point to the Anti-Eviction Act, which
applies to residents of "any house, building, mobile home or land
in a mobile home park or tenement leased for residential
purposes."  N.J. Stat. Ann. § 2A:18-61.1.  The problem with

applying this statute is that even if the vessels or the slips they occupy met this definition, the statute only applies to actions for removal initiated in New Jersey Superior Court.  Id.

The third state statute upon which Defendants attempt to rely is the Tenant's Reprisal Act, N.J. Stat. Ann. § 2A:42:10-10.10.  The act prohibits eviction in response to various protected actions, such as good faith complaints to government authorities about the conditions of the premises.  Id.  It applies to "all actions and proceedings by a landlord against a tenant to recover possession of premises used for dwelling purposes."  § 2A:42-10.8.  The statute does not define either landlord or premises.

The scope of the statute was discussed in Pohlman v. Metropolitan Trailer Park, Inc., 312 A.2d 888, 892 (N.J. Ch. 1973), in which the court addressed the question of whether the statute applied to mobile homes.  The court concluded that because of revisions to the landlord-tenant laws to cover mobile home owners that became effective after the initiation of that case, the statute should be read to cover the relationship of mobile home occupant to mobile home community.  In the absence of the state legislature's revision of landlord-tenant statutes to cover vessels not owned by the one providing dockage to them, or some evidence that these vessels were within the contemplation of the legislature in passing the anti-reprisal act, the scope of

21

the act should not be read to extend to the vessels in this action.

Moreover, the present action is neither an action "against tenants" (it is an in rem action), nor is it to "recover possession of premises."  The marina seeks to seize four vessels and sell them to cover the price of the necessaries provided to them.  Admittedly, some of the purposes behind the protections created by the Act may apply to the relationship between this Plaintiff and these vessel owners.  On the other hand, the vessels in this case are capable of being towed to a different marina and are not owned by the putative landlord.  These characteristics distinguish the vessel owners from the tenants the state sought to protect in these laws.  In the absence of any evidence of the legislature's intent to apply the statute to this kind of vessel-marina relationship, the Court is unwilling to overlook the plain language of the Act's description of its applicability.[16]

Finally, Defendants obliquely raise the argument that the unsigned dockage agreements between the parties import landlord-tenant law, regardless of whether the law would apply on its own

---

[16]  The Court is also dubious of the merits of Defendants' argument regarding reprisal.  Defendants have not clearly pointed to the behavior for which they believe this action is in reprisal.  They allude to the tenants' complaints made about the conditions of the marina, but fail to mention whether these complaints were made to state officials as the statute requires.

terms.[17]  Even if the Court assumes that the unsigned agreements
bind Plaintiff, Defendants make no argument for why the provision
in the agreements that they "shall be governed by and construed
in accordance with the laws of the State of New Jersey" should be
read to apply landlord-tenant law specifically, and not just New
Jersey contract law generally.  (Defs.' Ex-5, at 5.)  Nor do
Defendants explain why the provision providing for what law
governs the dockage agreements should also determine what law
governs the ability to bring this in rem necessaries lien action.
Defendants have not presented sufficient evidence or arguments
upon which the Court could conclude that the parties contracted
to apply landlord-tenant law to this action.

In summary, the state landlord-tenant statutes cited by
Defendants are not applicable by the terms of those statutes.[18]

---

[17]  Despite invitation from the Court to do so based on
limited remarks made by Defendants' counsel at these hearings,
Defendants have not argued — even the limited way that they
raised the issue of choice-of-law — that Plaintiff is a landlord
by judicial estoppel.  Defendants would be unlikely to be able to
prove such a claim because of the strict requirements.  See Chao
v. Roy's Const., Inc., 517 F.3d 180, (3d Cir. 2008) ("[J]udicial
estoppel is an extreme remedy, to be used only when the
inconsistent positions are tantamount to a knowing
misrepresentation to or even fraud on the court.") (internal
citations and quotations omitted).

[18]  The Court notes without deciding that these state laws
restricting landlords' ability to bring various legal actions may
be pre-empted if they were to apply to an action to enforce a
maritime lien.  46 U.S.C. § 31342(a).  The federal statute
clearly states that when the provision of necessaries to a vessel
has occurred, the lienholder "may bring a civil action in rem to
enforce the lien."  To allow state laws to prevent the bringing

Plaintiff is not a landlord by the terms of the registration statute, and Defendants are not protected by either the Anti-Eviction Act or the Tenant's Reprisal Act.  While it is unfortunate that these vessel owners may have believed they were protected by state landlord-tenant laws, their beliefs cannot overcome the plain language of those statutes.[19]

### 3.  Rent Control

The Egg Harbor Township Rent Control Ordinance, as of the revision on February 28, 2007, explicitly applies to a "landlord" of a "floating home" or "dock space appurtenant thereto."  § 180-1.  The ordinance places a cap on "[t]he amount of consideration . . . received by virtue of any agreement between the parties whereby, upon the payment of a sum certain by the tenant, the landlord allows to him the peaceful and quiet enjoyment of the use and occupation of the housing space for that time period."  Id.  Housing space is defined in relevant part as "[t]hat portion

---

of this action is to allow a state to trump the express language of a federal statute, which is impermissible under the Constitution's Supremacy Clause.  See, e.g., U.S. v. Locke, 529 U.S. 89, 120 (2000).

[19]  Fortunately for Defendants, the result is not as inequitable as they claim.  The law governing the determination of the quantum of maritime liens requires the Court to determine the reasonable price for the necessaries provided.  As discussed below, Plaintiff will only be entitled to a lien in a reasonable amount for the necessaries provided, taking into account many of the same factors as would be relevant under New Jersey landlord-tenant law, such as the quality of the necessaries provided.

of a dwelling rented," and dwelling is defined in relevant part as "floating home and/or slip or dock space appurtenant thereto rented or offered for rent or lease to three or more tenants or family units for living purposes." Id.

The question of the validity and possible effect of the local rent control ordinance is a question that need not be answered at this preliminary stage. Even if the ordinance applies here, and even if it limits the amount that could have been charged for dockage to a level below that now claimed by Plaintiffs, it would not reduce the amount owed to zero. The only possible way that the rent control ordinance could reduce the amount owed to zero is if Defendants were entitled to a credit in an amount exceeding that owed. Based on the testimony of Ms. Cox, no amount of rent was paid to Sea Village on behalf of Allen since December 2006 and Patterson since April 2007, so the amount of any credit would be smaller than any reasonable calculation of the amount owed. (Third Hearing Tr. 14:2-12, November 24, 2009.) The issue of rent control is therefore reserved for the determination of the quantum of the lien.[20] The

---

[20]   The Court notes that interpreting this ordinance will be somewhat complicated, and the parties should address this ordinance in subsequent motion practice if necessary. The original rent control ordinance was adopted on April 11, 1977. It provided that "[n]o landlord shall, after the effective date of this chapter, charge any rents in excess of what he was receiving on January 1, 1977, except for increases as authorized by this chapter." § 180-5(A). In revising the ordinance to make it apply to floating homes, the township added to that provision

25

Egg Harbor Township rent control ordinance may or may not apply, but in any event will not have the effect of reducing the reasonable amount owed to zero.

### 4.  Escrow As Substitute Security or Lien Waiver

The two contesting Defendants argue that the existence of the escrow prevents the enforcement of a lien against the vessels.  Defendants appear to conflate waiver of the lien and substitute security.  Waiver involves the acceptance of some form of security in lieu of a lien before any action has been taken to enforce the lien.  <u>S.S. Independence</u>, 872 F.Supp. at 267-68. When a lien has been waived, no enforcement action lies; instead, the provider of necessaries is entitled to the security that provided the basis of the waiver.  Substitute security, pursuant to Supplemental Admiralty Rule E(5) providing for release of property, involves some form of security being offered after the institution of an action against the vessel to take the place of

that "[t]his subsection shall become effective for floating home communities on the date of final adoption."  <u>Id.</u>  While the ordinance also states landlords of premises "being rented for the first time" may set their initial rent at any level, this provision would not apply here since the marina was charging rent before the date of final adoption of the revision. Thus, the literal reading of the ordinance requires that Sea Village not "charge any rents in excess of what [it] was receiving on January 1, 1977."  <u>Id.</u>  This requirement is unlikely to have been the intended effect of the ordinance, and appears instead to be a drafting error.  What exactly the township intended to set as the baseline rate is a matter the parties may need to address.

the vessel.  It must be accepted by the lienholder or found sufficient by the court.  Id.

Neither waiver nor substitute security applies here.  The escrow has not been accepted by Plaintiff or offered to the Court pursuant to Rule E(5), so it cannot constitute substitute security, even if it met the other requirements of such security. See id.

Waiver of a necessaries lien requires that Plaintiff take affirmative actions that manifest clear and purposeful intention to forego the lien.  S.S. Independence, 872 F.Supp. at 267 (citing Equilease Corp. v. M/V Sampson, 793 F.2d 598, 606 (5th Cir. 1986)).  There is no allegation that this has happened here. Instead, what is alleged is solely that Plaintiff accepted security in the form of the escrow.  But mere efforts at obtaining collateral security do not suffice to waive a lien in the absence of some additional evidence of the intention to waive it.  Id.

Defendants argue that the terms of the escrow agreement indicate Plaintiff's intention to waive the lien.  Specifically, Defendants argue that entering into an arrangement in which only part of the dockage is released, and release of the full amount depends on the satisfaction of some condition, is inconsistent with Plaintiff's retention of the ability to simply seize the vessels to satisfy the dockage debts.  But this argument could be

27

made with regard to any effort to obtain collateral security. The reason a lienholder goes through the effort to obtain collateral security when the lienholder can simply seize the vessels is that seizure is a radical measure, it is costly, and it is often easier to secure the debt by other means.[21]

In the absence of any evidence that Lieberman intended to waive the liens by obtaining collateral security, the Court is not persuaded that Sea Village Marina's entry into the escrow agreement constituted affirmative waiver of the right to a maritime lien.  See Equilease, 793 F.2d at 606.

The effect of the escrow agreement, if any, on the quantum of the lien is a matter that need not be determined at this stage.  The only allegation with regard to payments having been made from the escrow is the undifferentiated $20,500 that Ms. Cox testified was released from the escrow to Plaintiff.  At this stage the existence of the escrow and the undifferentiated payment do not convince the Court that the Plaintiff lacks reasonable grounds for the arrest of the vessels.

### 5.  Tidelands Lease

Finally, Defendants urge that Plaintiff cannot collect for

---

[21] For example, it is not clear whether the marina can collect for dockage from the period during which the vessels are in federal custody.  Cf. The William Leishear, 21 F.2d 862, 865 (D. Md. 1927).

the necessaries provided after the expiration of the tidelands lease since Plaintiff was merely trespassing upon the tidelands (and so, presumably, were Defendants).

The State of New Jersey "is the proprietor of all lands under tidewater below high water mark (tidelands) and possesses all of the incidents of ownership, including the absolute discretion in making conveyances or granting licenses to its tidelands." In re Tideland's License 96-0114-T, 740 A.2d 1125, 1127 (N.J. Super. Ct. App. Div. 1999).[22]  Sea Village Marina was granted a lease to use the area of tidelands upon which it is situated for a period of seven years beginning in June 2000.[23] (Def. Ex-10.)  The lease expired in June 2007 and was not renewed.  The lease provides that upon termination Sea Village must quit the premises and remove all structures from the tidelands.[24]  (Id.)

_____

[22]  The Court assumes without deciding for the purposes of this discussion, since no party has argued otherwise, that ordinary property law applies to the tenancy relationship between the State of New Jersey and the marina.

[23]  The instrument uses the term "license/lease," apparently recognizing no legal significance in the difference between the terms.  Since the question of whether the instrument is a license or lease does not seem to be relevant here, the Court will use the term lease with the recognition that the property interest may be narrower than that normally conveyed in a lease.

[24]  Every lease contains the covenant that "tenant is under the duty to deliver up the premises to the landlord on the termination of a lease," whether explicitly or implicitly.  49 Am. Jur. 2d Landlord and Tenant § 273 (2009).

A fundamental tenet of property law is that a lawful entrant onto land does not become a trespasser at the termination of his license.  Xerox Corporation v. Listmark Computer Systems, 361 A.2d 81, 86 (N.J. Super. Ct. App. Div. 1976); 49 Am. Jur. 2d Landlord and Tenant § 273 (2009); Restatement (Second) Property § 14.7 (1977).  Instead, he becomes a tenant at sufferance.  Xerox, 361 A.2d at 86.  Sea Village Marina is, at the very least, a tenant at sufferance, not a trespasser upon the tidelands.

While the state has tacitly allowed the marina to continue its operations and Plaintiff has testified that the Department of Environmental Protection (DEP) and Plaintiff are in renewal negotiations, DEP has not yet accepted any rent or license payment, so a month-to-month tenancy has not been created.  N.J. Stat. Ann. § 46:8-10.  Nevertheless, the status of a tenant who has overstayed his lease is determined by the prerogative of the landlord.  Sheild v. Welch, 73 A.2d 536, 538 (N.J. 1950); Restatement (Second) Property § 14.4 (1977).  New Jersey law is not entirely clear on the status of a holdover tenant when a landlord neither accepts new rent and consents to the tenancy nor seeks to evict a holdover tenant.  This Court finds that when the tenant is in negotiations with the landlord to renew the lease, the tenant is best characterized as a tenant at will whose rights are governed by the terms of the expired lease.  Cf. Newark Park Plaza Assoc. v. City of Newark, 227 N.J. Super. 496, 499 (Law

30

Div. 1987) (noting that terms of expired lease govern holdover tenants).

Even if the DEP's tacit consent to the marina's continued operation does not transform the marina into a tenant of the tidelands at will, the question would be whether a tenant at sufferance may nonetheless lawfully collect for the services he provides from the premises after lease expiration.  While this may be a closer question than if the tenant is a tenant at will, the Court finds that the result would be the same.

There is some support for the proposition that a tenant at sufferance cannot sublet the premises.  Cf. Griffin v. Reynolds, 107 S.W.2d 634 (Tex. Civ. App. 1937).  But unlike the example of a sub-lease, in which the tenant at sufferance is offering something of value in which he has no legal interest whatsoever — a possessory right to the premises — the provision of various services including dockage is not an offer of something in which the tenant has no legal interest.  By analogy, if a service station's lease with its landlord expired, yet the station continued to repair vehicles, there is no reason the station should not receive payment for its repair services.  This is not to say that the services provided and the license to use the tidelands are not related.  They are related, but not in the kind of one-to-one relationship that a sub-lease and lease are related.

31

This Court is not aware of any precedent on the question of whether a tenant at sufferance may benefit from services he provided incident to his occupancy of the premises.  The party wronged in such a scenario is the landlord (here, the State of New Jersey), if anyone, whose remedy is to remove the tenant or seek reasonable rent for the period of his tenancy.  This Court sees no reason why a third party beneficiary of a tenant at sufferance's tenancy should be given the benefit of free services as a result of any wrong done to the landlord.[25]

### C.  Quantum of Lien

The federal statute governing necessaries liens is silent on the question of how to determine the quantum of such liens.  See 46 U.S.C. § 31342.  Because a lien for necessaries arises in order to ensure that the provider of necessaries can receive reasonable recompense, the amount of the lien is determined by the reasonable price for the necessaries provided.  S.E.L. Maduro, 833 F.2d at 1482.[26]  For the purposes of this post-arrest

---

[25]  Perhaps the tenuous relationship between the marina and the state undermines the value of the dockage provided, since the docks used by the vessels could have been removed by the state during their occupancy.  But this would be a question reserved for the quantum of the lien.

[26]  Because the Court finds that the amount of the lien will be set to the reasonable price of the dockage under the circumstances, there is no need to address Defendants' argument that they are entitled to an abatement of the dockage based on the habitability of the conditions.  The application of either

hearing, the Court need not decide what amount is reasonable. Instead, the Court need only decide that the reasonable amount is in excess of what has been paid to the marina.

Reasonableness of the price of the necessaries is measured by the customary amount charged for the services in question. See Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1249 (11th Cir. 2005).  What amount constitutes reasonable compensation is ultimately a case-by-case factual judgment to be made on the evidence in front of the court.  Cf. McMillan Welding and Mach. Works v. General Towing Co., 247 F. Supp. 402, 405 (D. La. 1965).

The necessaries provided in this case are unique.  The only relevant customary rate is what is charged for ordinary vessels at other marinas, which may be inappropriate here given the nature of these vessels, the nature of the marina, and all the other circumstances of this case.  Moreover, the Court can ascertain what dockage was actually being charged these vessels over the relevant period ($633.75).  The Court also has the rate agreed to by the parties in the Agreement As To Rental Dispute ($500).  The parties also agreed on the amount by which the dockage should be reduced because of the water quality issues ($100).  While these amounts are not binding for the purposes of calculating the amount of this necessaries lien, they do provide

---

standard requires the same inquiry and yields the same result.

the Court with a reasonable starting point.[27]

With those amounts as a general starting point, the Court will consider all factors that may cause it to depart from that rate in determining what rate is reasonable.  These factors include, but are not limited to, any problems with the marina not contemplated by the agreements that might lower the amount of a reasonable price for dockage (such as the conditions of the marina including the need for dredging to alleviate the inability of certain vessels to float at low tide, causing tilting of the vessel as testified by Mr. Allen).  The Court must also determine what percentage of the dockage rate was for necessaries, and what was for other services that will not be included in calculation of the maritime lien.  Finally, the Court may consider argument on whether the rent control ordinance should set an even lower baseline to which the above factors will be applied.

Preliminary consideration of these factors reveals that some amount is reasonably owed by the vessel owners, even if it is

---

[27] As the Court explained above, a necessaries lien is independent of contract.  The enforcement of a lien provides reasonable compensation for services provided, while the enforcement of a contract entitles one to the benefit of one's bargain.  S.E.L. Maduro, 833 F.2d at 1482-83.  These amounts can be and often are different.  Not only might the measure for recompense vary from the amount agreed in a contract, but the lien is to provide compensation for only those services qualifying as necessaries.  Additionally, even if an existing contract would in some cases determine the appropriate amount of a necessaries lien, in this case Plaintiff has not demonstrated that it has any valid written contract with any of the Defendants as to the rate of dockage.

small.  Whatever problems the marina has, it is apparent that the
necessaries it provided over the relevant period were worth more
than the amount of money that has been released to it from the
escrow.  These vessels have been provided with mooring, use of
docks, utility hookups and other vessel amenities that, without
doubt, have a value greater than the amounts actually received by
the marina from the escrow.

## IV.  CONCLUSION

Plaintiff has shown that it provided necessaries to these
vessels on the order of their owners within the meaning of 46
U.S.C. § 31342(a), and has not been paid in full.  Plaintiff is
entitled to a maritime lien and has therefore shown reasonable
grounds for the arrest of the vessels pursuant to Supplemental
Rule E(4)(f) and Local Admiralty Rule (e)(8).  None of
Defendants' other arguments undermine Plaintiff's showing that it
is entitled to a maritime lien in some amount, even though they
will be relevant to the ultimate determination of the amount of
that lien at a final hearing.  The landlord-tenant laws either do
not apply, or do not reduce the amount owed to zero, the lien was
not waived, and the expiration of the State Tidelands lease does
not prevent the marina from lawfully collecting for the provision
of services to Defendants.  Finally, the Court has given notice
to Plaintiff and Plaintiff's counsel of its concerns that the

Verified Complaint contained claims for liens in amounts that were materially false, and that Plaintiff submitted statements of account containing knowingly inflated amounts of indebtedness, and will schedule a further hearing to address these concerns, and to determine what sanctions, if any, are warranted, in conformance with the accompanying Order to Show Cause.  The accompanying Orders shall be entered.

**January 26, 2010**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            U.S. District Judge